IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARNELL BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 02-4683 |
| | ) | |
| v. | ) | Judge James Knoll Gardner |
| | ) | |
| LUCENT TECHNOLOGIES INC. and | ) | |
| AGERE SYSTEMS INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Lucent Technologies Inc. ("Lucent") and Agere Systems Inc. ("Agere"), by

and through their undersigned counsel, hereby file this Memorandum of Law in Support of their

Motion for Summary Judgment.

## I.      INTRODUCTION

Plaintiff Garnell Bailey ("Bailey") filed a two-count Amended Complaint against

Defendants alleging that Defendants discriminated against her in the terms and conditions of her

employment based on her race, sex and disability and in retaliation for filing a charge of

discrimination.  Defendants have denied these claims and now move for summary judgment.  As

set forth herein, Agere terminated Bailey for threatening her supervisor, and made all other

decisions regarding her employment for legitimate, non-discriminatory reasons.  Therefore,

Defendants' Motion for Summary Judgment should be granted.

## II.      STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.      Lucent Technologies Inc./Agere Systems Inc.**

Lucent was the former telecommunications systems group of AT&T Corp.   Lucent is a

publicly-traded company that designs and delivers networks for the world's largest

communications service providers.  Agere was the former Microelectronics unit of Lucent.

Agere is a premier provider of advanced integrated circuit solutions for wireless data, high-density storage and multiservicing network applications. Agere's initial public offering occurred in April 2001, and the company remained a majority-owned public subsidiary of Lucent until June 2002, when it was spun off. [1]  (Pennington Aff. ¶¶ 2-3).[2]

### B.    Bailey's Employment History with Agere and its Predecessors

Bailey was hired by AT&T in 1982, and worked for AT&T, Lucent and Agere until her termination on December 9, 2001.  (Bailey Dep. at 30, 72; Bailey Ex. 2).  When she started with AT&T in 1982, Bailey worked in the finance department located in Plainfield, New Jersey. (Bailey Dep. at 22-23).  In 1986, Bailey moved into a position as a Human Resources Generalist with AT&T, which she held until 1995.  (Bailey Dep. at 30-31).

In 1995, Bailey became a Senior Manager, Human Resource Business Partner for the Microelectronics unit of Lucent, based in Allentown.  (Bailey Dep. at 32-33).  At this time, she began working for Dewayne Rideout ("Rideout"), the Director of Human Resources for Lucent's Microelectronics unit.  (Bailey Dep. at 37).  From 1997 to 2000, Bailey held the position of Senior Manager, Learning and Organizational Development, Diversity Management, EO/AA for Lucent, then Agere.  (Bailey Dep. at 36-37).

In or around August 2000, Rideout told Bailey that he was changing her title from Senior Manager to Director.  (Bailey Dep. at 37).  Although this change was recorded within Lucent's computer system, Rideout did not obtain the appropriate approval – signature from Agere's President and approval of Agere's Executive Committee – required by Agere's D-Level Promotion Policy. (Pennington Dep. at 29-33; Bailey Dep. at 78; Bailey Ex. 5).

---

[1] As set forth herein, Bailey worked in the Microelectronics unit of Lucent, which became Agere in contemplation of the April 2001 initial public offering.  Bailey remained employed with Agere through her termination of employment on December 9, 2001.  For ease of reference, Lucent and Agere hereafter will be jointly identified as "Agere" or "Defendants."

[2]  All portions of the record cited herein are contained in the Appendix to Memorandum of Law in Support of Defendants' Motion for Summary Judgment.

**C.    Agere's Force Management Program and Bailey's Reassignment**

In February 2001, Agere hired Kevin Pennington ("Pennington") as its Senior Vice President of Human Resources. (Pennington Dep. at 4). Pennington was brought in to establish a new human resources structure for Agere following its spinoff from Lucent. (Pennington Dep. at 8). Because Pennington was brought in at the Vice President level, Rideout, who was a Director, reported to him. (Pennington Dep. at 9). Rideout left the company in the spring of 2001, approximately two months after Pennington arrived. (Pennington Dep. at 12).

Over the next several months after he was hired, Pennington proceeded with the task of creating and filling his new human resources structure. Pennington felt he needed a Vice President-level individual to run the human resources operations. He hired Paul Dumas ("Dumas") for this position. (Pennington Dep. at 11). At the time he was hired, Dumas could not be brought in at a Vice President-level title, but he was hired with the intent of being promoted to Vice President, which eventually happened. (Pennington Dep. at 11-14). Dumas' responsibilities were to oversee all human resource operations, which included the human resources support for all different parts of Agere's business, as well as human resource information, payroll and administration. (Pennington Dep. at 15). Pennington also hired John O'Donnell ("O'Donnell") to be Director of Benefits, and Mike Henrici ("Henrici") to be Director of Payroll and Human Resources Information Services. (Pennington Dep. at 19). In addition, Pennington promoted Russ Diehl ("Diehl") from Senior Manager to Director responsible for the budget, human resource planning and administration within the Human Resources department. (Pennington Dep. at 22). Other Directors in the Human Resources department included Theo Bell, a black male, and Patricia Schuster, a white female. (Bailey Dep. at 50).

As part of the reorganization, Pennington offered Bailey the position of Director of Diversity and Business Ethics. (Bailey Dep. at 40; Pennington Dep. at 25). Bailey was offered this new position, in part, because the training function she previously had supervised had been

eliminated. (Pennington Dep. at 23-25). As part of Agere's Force Management Program ("FMP"), a company-wide plan managing reductions in Agere's workforce, most of the 57 employees who previously had been reporting to Bailey were laid off due to the elimination of her department. (Bailey Dep. at 53-54, 92; Pennington Dep. at 25-26). At that same time, in spring 2001, Agere laid off over 2,000 total employees. (Pennington Aff. ¶ 4). To date, the FMP has affected over 10,000 employees company-wide since the beginning of 2001. (Pennington Aff. ¶ 4).

**D.    Compensation of Directors in Agere's Human Resources Organization**

When Pennington came to Agere in early 2001, Bailey's salary was $118,500 per year. (Bailey Dep. at 74, 106; Bailey Ex. 3). This compensation had been determined by Rideout. (Bailey Dep. at 106). As part of his reorganization of the Human Resources department, Pennington reevaluated all of his Directors' salaries in the summer of 2001. (Pennington Dep. at 53). It was at this time that, in conjunction with his promotion to Director, Diehl's salary was raised to $136,000, and Henrici and O'Donnell were hired as Directors at salaries of $190,000 and $150,000, respectively. (Pennington Aff. Ex. B at D 0167, Ex. C at D 0172, Ex. D at D 0159). Dumas, who was hired with the understanding that he would be promoted to Vice President, continued to be paid $230,000. (Pennington Aff. Ex. A at D 0147).

Bailey's salary for her new position of Director of Diversity and Business Ethics would have been reevaluated around the same time if she had not been on short-term disability leave. (Pennington Dep. at 54). Pennington never had the opportunity to reevaluate Bailey's salary, because she was terminated upon her release to return to work because of threats she made toward Pennington.

In addition to base salary, Agere had various additional forms of employee compensation, including stock options. As part of its initial public offering ("IPO"), Agere granted stock options to its employees in March 2001. Agere had published guidelines which provided

guidance on the amount of discretionary stock options that should be granted to management employees at various levels. (Pennington Dep. at 89; Pennington Ex. 4). These guidelines suggested a grant of 15,000 – 25,000 options for Senior Managers, and 45,000 – 75,000 options for Directors. (Pennington Ex. 4). At the time he approved her stock options, Pennington thought Bailey was a Senior Manager. (Pennington Dep. at 87). Although the guidelines, therefore, suggested an upper limit of 25,000 options for Bailey, Pennington approved her for 30,000 options based on Rideout's suggestion that this amount was warranted in recognition of additional duties Bailey undertook during the IPO. (Pennington Dep. at 87).

## E.    Bailey's Disability Leave

After the spring 2001 FMP and the announcement of the reorganization of the Human Resources department, Bailey was disenchanted with the new duties Pennington had assigned to her, and expressed as much to him. (Pennington Dep. at 49). On June 8, 2001, during a meeting to discuss Bailey's decision to terminate an employee as part of the reduction in force, Bailey got up and abruptly left. (Bailey Dep. at 66-67; Pennington Dep. at 42). She went out on disability leave that day. (Bailey Dep. at 67). Bailey indicated to her health care providers that she was upset over the reductions in force that had resulted in the elimination of her prior department. (Gordy Dep. at 11; Gordy Ex. 1 at PG 0016-0017, 0021; Goy Dep. at 13-14; Goy Ex. 2 at D 0195; Twaddle Dep. at 16; Twaddle Ex. 1 at HT 0007; Lovegrove-Geise Dep. at 11). Bailey complained of an inability to concentrate and problems sleeping. (Gordy Dep. at 13-14; Gordy Ex. 1 at PG 0022; Goy Dep. at 14; Goy Ex. 2 at D 0195; Twaddle Dep. at 16; Twaddle Ex. 1 at HT 0007; Lovegrove-Geise Dep. at 11-12). As a result, her primary care physician, Dr. Gopal, deemed her unable to work effective June 18, 2001. (Gordy Dep. at 26-27; Gordy Ex. 1 at PG 0024)

After Bailey went on disability leave, Susan Lovegrove-Geise ("Lovegrove-Geise"), a Licensed Clinical Social Worker who managed Agere's Employee Assistance Program ("EAP"),

referred her for counseling.  Bailey saw a therapist, Licensed Social Worker Patricia Gordy, and a psychiatrist, Dr. Abel Gonzalez.  (Lovegrove-Geise Dep. at 17-18).  In addition, as was her practice with employees on disability leave, Lovegrove-Geise regularly checked in with Bailey to monitor her progress.  (Lovegrove-Geise Dep. at 19).

Bailey responded well to her treatment, and her symptoms of anxiety were controlled through medication.  (Gordy Dep. at 29-30; Gordy Ex. 1 at PG 0027; Twaddle Dep. at 22-23; Twaddle Ex. 1 at HT 0005).  By the fall of 2001, she was doing much better, and her health care providers uniformly agreed that any limitations she was suffering from her mental condition had subsided by October or November 2001.  (Twaddle Dep. at 35; Twaddle Ex. 1 at HT 0005; Gordy Dep. at 44-45; Gordy Ex. 1 at PG 0011).  Bailey was released to return to work on December 9, 2001.  (Goy Dep. at 34-35; Goy Ex. 9; Twaddle Dep. at 31-33; Twaddle Ex. 4).  She has experienced no subsequent limitation in her ability to work.  (Bailey Dep. at 230-31).

## F.  Bailey's Threats Against Pennington and Her Subsequent Termination

Although Bailey's symptoms had improved throughout the summer, she continued to report anger toward Pennington resulting from what she viewed as her mistreatment in his reorganization of the Human Resources department.  This anger eventually manifested itself in threats on Pennington's life.

On August 21, 2001, Bailey called her therapist, Gordy, which she had never done before.  (Gordy Dep. at 32-33).  Bailey told Gordy that she had bought a gun and a hundred bullets that "have Kevin Pennington's name on them."  (Gordy Dep. at 32; Gordy Ex. 1 at PG 0003).  Gordy was "alarmed" by Bailey's report and felt it was not an appropriate response for someone with Bailey's symptoms. (Gordy Dep. at 52-53).  Even though Bailey told Gordy she did not intend to harm anyone, Gordy had concerns and felt that she had a professional duty to warn.  (Gordy Dep. at 33-34).  A professional duty to warn is initiated when a health care provider believes that a patient cannot "contract for safety" – *i.e.*, guarantee that she will not

6

harm others or herself.  (Gordy Dep. at 53; Lovegrove-Geise Dep. at 25-26).  As a result of

Bailey's threat toward Pennington, Gordy phoned both Lovegrove-Geise at Agere, to notify her

of the threat, and Bailey's husband, to insure that Bailey did not have access to the gun.  (Gordy

Dep. at 34-35; Gordy Ex. 1 at PG 0003-04).

     Bailey made another threat toward Pennington on October 1, 2001, when Lovegrove-

Geise made a routine phone call to Bailey to discuss an upcoming disability appointment with

Dr. Richard Goy, an Agere contract physician.  (Lovegrove-Geise Ex. 1).  During this

conversation, Bailey told Lovegrove-Geise that she had bought a gun.  (Lovegrove-Geise Dep. at

21; Lovegrove-Geise Ex. 1).  Lovegrove-Geise clarified Bailey's statement and explained her

professional duty to warn.  Lovegrove-Geise then asked Bailey:  "Can you tell me you will not

harm Kevin Pennington?," to which Bailey responded:  "I cannot tell you that I would not harm

Kevin Pennington."  (Lovegrove-Geise Dep. at 22, 25-26; Lovegrove-Geise Ex. 1).

     Lovegrove-Geise reported this threat to Pennington and to Agere's Security department.

(Lovegrove-Geise Dep. at 23-24).  Pennington, understandably, was unnerved and threatened by

Bailey's comments.  He immediately called his wife to warn her to be careful, spoke with Agere

Security and called the police.  (Pennington Dep. at 63-64).  Agere Security also offered to

provide Pennington with personal protection as a result of the matter.  (Pennington Dep. at 67).

     As a result of Bailey's threat, Pennington made the decision to terminate Bailey's

employment.  (Pennington Dep. at 67).  Pennington felt he could no longer work with Bailey

after she had threatened him.  (Pennington Dep. at 67-68).  Accordingly, upon her return to work

from disability leave on December 9, 2001, Agere terminated Bailey's employment.

(Pennington Dep. 93-94; Pennington Ex. 7).

**G.    Bailey's EEOC Charges of Discrimination**

     Bailey filed a charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC") on August 15, 2001.  (Bailey Dep. 260-61; Bailey Ex. 29).  In that

charge, Bailey alleged that Agere had discriminated against her on the basis of race and sex, with

respect to her salary, stock options and reassignment.  (Bailey Ex. 29).  On March 27, 2002,

Bailey filed a second charge of discrimination with the EEOC.  (Bailey Dep. at 261; Bailey Ex.

39).  In it, Bailey asserted:  "I was clearly terminated in retaliation for my having filed and

pursued claims of employment discrimination against Agere."  (Bailey Ex. 39).  Her second

charge included claims of race and sex discrimination and retaliation, but no claim of disability

discrimination.  (Bailey Ex. 39).  This lawsuit followed.

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the evidence, viewed in the light most favorable

to the non-moving party, shows "that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  The moving party is not required to provide

evidence "negating the opponent's claim," but rather need only show "that there is an absence of

evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 323,

325 (1986).  The burden then shifts to the non-moving party to point to specific evidence – as

opposed to mere allegations, general denials or vague statements – establishing a genuine issue

for trial.  Id. at 324; Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002).

### IV.    ARGUMENT

Agere is entitled to summary judgment on all of Bailey's claims.  Agere terminated

Bailey because she threatened Pennington; there is no evidence that the termination decision was

based on any discriminatory or retaliatory animus.  The remainder of Bailey's claims of race

and/or sex discrimination fails because the undisputed evidence establishes that Agere

compensated, provided stock options to and otherwise managed Bailey based on legitimate, non-

discriminatory business considerations.  Finally, Bailey's disability discrimination claim, in

addition to failing because Agere terminated her for making a threat, also fails because Bailey

failed to exhaust her administrative remedies and cannot establish that she was "disabled" under the ADA.

**A.    Agere is Entitled to Summary Judgment on Bailey's Race and Sex Discrimination Claims**

Bailey claims Agere discriminated against her based on her race and sex (1) when it terminated her employment; with respect to (2) her salary and (3) her stock options; and (4) by undermining her authority.  Bailey's claims must fail because there is no evidence that Agere took the actions she challenges because of her race or sex, as opposed to for legitimate, non-discriminatory business reasons.

Bailey's race and sex discrimination claims "require application of the familiar burden-shifting framework of the Supreme Court articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 729, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973)." <u>Jones v. School Dist.</u>, 198 F.3d 403, 410 (3d Cir. 1999).  Under this three-stage analysis:

> First, the plaintiff must establish a *prima facie* case of discrimination.  If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection.  Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

<u>Id.</u> (quotation omitted).[3]

Bailey's race and sex discrimination claims fail as a matter of law.  Specifically: (1) Bailey was terminated because she threatened Pennington by buying a gun which she indicated she may use to harm him, and there is no evidence that this decision was a pretext for discrimination; (2) Bailey cannot establish a *prima facie* case of unequal pay, because she was not performing equal work to the white male individuals to whom she compares herself;

---

[3] Bailey's race and sex discrimination claims under the Pennsylvania Human Relations Act ("PHRA") are subject to the same analysis as her Title VII claims.  <u>Knabe v. Boury Corp.</u>, 115 F.3d 407, 410 n.5 (3d Cir. 1997).

(3) Bailey received an appropriate amount of stock options given her position; and (4) Agere's actions by which Bailey claims her authority was undermined were legitimate business decisions.

### 1.    Agere terminated Bailey for making threats of violence toward Pennington.

There is no dispute that Pennington decided to terminate Bailey because she had made threats of violence toward him, not for any reason related to her race or sex.  It is beyond cavil that threats of violence toward a co-worker are a legitimate, non-discriminatory reason for discharging an employee.  Davis v. City of Philadelphia Water Dep't, 57 Fed. Appx. 90, 2003 WL 236246 (3d Cir. Jan. 30, 2003) (rejecting race discrimination claim because employee was legitimately terminated for making death threats); Phillips v. Union Pac. R.R., 216 F.3d 703, 706 (8th Cir. 2000) (holding in context of Title VII race discrimination claim that threatening a co-worker with bodily harm was non-discriminatory reason for suspension); Jones v. American Postal Workers Union Nat'l, 192 F.3d 417, 429 (4th Cir.1999) (holding that employer was entitled to discharge employee after he threatened life of his supervisor, even if such misconduct was caused by employee's disability); Dose v. Buena Vista Univ., 229 F. Supp. 910, 916, 926 (N.D. Iowa 2002) (employee's statement that supervisor "should wear a bullet proof vest" was legitimate, non-discriminatory reason for discharge entitling employer to summary judgment on disability discrimination claim); Hugley v. Art Institute of Chicago, 3 F. Supp.2d 900, 902, 909 (N.D. Ill. 1998) (granting summary judgment to employer in race discrimination claim brought by employee who was terminated for threatening to "bust a cap" (shoot) a fellow employee).

Here, Bailey told Lovegrove-Geise (1) that she had bought a gun, and (2) that she could not tell Lovegrove-Geise she would not harm Kevin Pennington.  (Lovegrove-Geise Dep. at 22,

25-26; Lovegrove-Geise Ex. 1).[4]  Bailey's threats toward Pennington were, undisputedly, the

reason Agere terminated her.  (Pennington Dep. at 67-68, 93-94; Pennington Ex. 7).   In addition

to feeling genuinely threatened by Bailey's actions – Pennington called his wife to warn her,

spoke with Agere Security, and called the police, (Pennington Dep. at 63-64) – Pennington felt

he could no longer work with Bailey after she had threatened him.  (Pennington Dep. at 67-68).

Thus, the termination decision was completely unrelated to Bailey's race or sex.

Throughout this litigation, Bailey has attempted to suggest she never really intended

harm to Pennington, that Lovegrove-Geise did not actually have a duty to warn Pennington, and

that Agere overreacted to Bailey's threats.  While Agere disagrees with these conclusions,

Bailey's contentions "miss the point."  See Hugley, 3 F. Supp.2d at 907.  In response to similar

allegations that an employer had improperly investigated alleged threats of harm, the Hugley

court recognized that these considerations are irrelevant to the discrimination determination:

> The issue here is not the adequacy of the [security director's] investigation, the
> sufficiency of the evidence before the grievance committee, or even whether the
> threat actually occurred.  It is not appropriate for this Court to evaluate the
> investigations and hearings surrounding Hugley's termination because we do not
> sit as a super-personnel department that re-examines an entity's business
> decisions.  Nor is our role to determine if Hugley was treated fairly … unless he
> can show treatment different from others outside the protected class.

Id. (citations and quotations omitted).  The Third Circuit has recognized the same general

principle.  Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 332 (3d Cir. 1995) ("[W]e

do not sit as a super-personnel department that reexamines an entity's business decisions. No

matter how medieval a firm's practices, no matter how high-handed its decisional process, no

matter how mistaken the firm's managers, … our inquiry is limited to whether the employer gave

---

[4] Bailey had previously told her therapist, Gordy, that she had bought a gun and a hundred
bullets that "have Kevin Pennington's name on them."  (Gordy Dep. at 32; Gordy Ex. 1 at PG
0003).

an honest explanation of its behavior.").[5]

As these cases make clear, whether or not Lovegrove-Geise or Pennington reacted appropriately to Bailey's threats – or even whether Bailey was threatening Pennington at all – are issues that have no relevance to Bailey's discrimination claims.[6]  Because Agere terminated Bailey for making threats against Pennington, her race and sex discrimination claims based on her termination must fail.

With respect to her sex discrimination claim, Bailey also suggests that she was treated differently than Rideout, a black male,[7] who she alleges had threatened co-workers Matt Riley ("Riley") and Dennis Hill ("Hill").[8]  (Bailey Dep. at 279-81).  In order to properly compare herself to Rideout, however, Bailey must show "that [Rideout's] acts were of 'comparable seriousness' to her own infraction."  See Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994).  To make such a showing, Bailey must demonstrate that Rideout "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  See id.  Rideout's case is clearly distinguishable, however, because he never acted in a way that caused Riley or Hill to fear for

---

[5]  Although Brewer was decided under the Age Discrimination in Employment Act, the logic is equally applicable under Title VII, since the two statutes are analyzed using the same McDonnell Douglas burden-shifting framework.  Brewer, 72 F.3d at 330.

[6]  Therefore, it is irrelevant that Bailey denies that she told Lovegrove-Geise that she could not guarantee that she would not harm Pennington.  (Bailey Dep. at 138).  All that matters is that Lovegrove-Geise honestly believed that Bailey posed a threat and that she had a professional duty to warn Pennington.  (Lovegrove-Geise Dep. at 51).  Similarly, Gordy had felt a duty to warn when Bailey told her that she had a gun and 100 bullets with Pennington's name on them, notwithstanding the fact that Bailey had denied any intent to harm Pennington.  (Gordy Dep. at 32-34).

[7]  Bailey acknowledges that treating her differently than Rideout would not be race discrimination. (Bailey Dep. at 291-92).

[8]  Although Bailey also claimed that she had heard of an alleged threat by Rideout toward Dan Dileo ("Dileo"), she had no knowledge of such a threat and Dileo has denied that it ever occurred.  (Bailey Dep. at 289-90; Dileo Aff. ¶ 3).

their safety, nor did he ever indicate that he possessed a gun or any other means to harm them. (Riley Aff. ¶¶ 3-4; Hill Aff. ¶¶ 3-5).

The comparison here is similar to that in <u>Phillips</u>, 216 F.3d at 706.  There, an employee who was terminated for threatening a co-worker with bodily harm tried to compare herself to another employee who she claimed had engaged in similar conduct.  The Eighth Circuit rejected the comparison because the other employee's conduct did not involve death threats or cause the company to fear that he might intentionally harm a co-worker.  <u>See id.</u>  For similar reasons, Rideout is not similarly situated to Bailey.  Unlike Bailey, who indicated she had a gun and caused the company to fear that she seriously intended to harm Pennington, Rideout's conduct amounted to disagreements in meetings with co-workers, none of whom ever felt threatened by him.  Unlike with Bailey, Agere never believed that Rideout intended to harm any Agere employee, and his treatment has no bearing on Bailey's sex discrimination claim.  <u>See also</u> <u>Davis</u>, 2003 WL 236246, *2 (terminated black employee who made death threats could not compare himself to white employees who engaged in short-lived flare-ups during disagreements with other employees).

In sum, Bailey was terminated because she threatened Pennington.  There is no dispute that Agere took the threat seriously and that the threat alone were the reason for Bailey's termination.  Therefore, Agere is entitled to summary judgment on Bailey's race and sex discrimination claims related to her termination.

**2.    Bailey's compensation was not related to her race or sex.**

Bailey claims that she was compensated differently when compared to her white male counterparts Dumas, Henrici, O'Donnell and Diehl, (Bailey Dep. at 61), and that these compensation decisions amounted to discrimination under Title VII and the Equal Pay Act ("EPA").   The compensation of these individuals, however, is not evidence of race or sex discrimination.

Bailey's equal pay claims under the EPA and Title VII fail because she cannot establish that Agere paid her less than men who were performing similar work.  Because a violation of the EPA constitutes a violation of Title VII, a *prima facie* showing of an EPA claim and of a Title VII violation based on unequal pay are the same.  Miller v. Beneficial Management Corp., 977 F.2d 834, 846 (3d Cir. 1992).  To establish a *prima facie* case of discriminatory compensation under the EPA and Title VII, Bailey must prove that Agere pays different wages to employees of the opposite sex or race "for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions."  Byrnes v. Herion, Inc., 764 F. Supp. 1026, 1030 (W.D. Pa. 1991) (citing Angelo v. Bacharach Instrument Co., 555 F.2d 1164 (3d Cir. 1977), quoting Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974)).

The EPA affords relief only when males and females are paid different wages for *equal work*.  Mere comparability of positions is not sufficient to give rise to an inference that the positions at issue are "equal" as that term is used in the EPA.  Angelo, 555 F.2d at 1176.  "Failure to furnish equal pay for 'comparable work' or 'like jobs' is not cognizable under the Act."  Welde v. Tetley, Inc., 864 F. Supp. 440, 442 (M.D. Pa. 1994) (citing Nulf v. International Paper Co., 656 F.2d 553, 560 (10th Cir. 1981)).  To satisfy her burden of proving the "equal work" component of her EPA claim, Bailey must establish that her job and the jobs to which she compares it have a "common core" of tasks, *i.e.*, that "a significant portion of the jobs is identical."  Byrnes, 764 F. Supp. at 1030 (citing Brobst v. Columbus Servs. Int'l, 761 F.2d 148 (3d Cir. 1985)).

Bailey's equal pay claims fail as a matter of law because she cannot establish that the jobs of Dumas, Henrici, O'Donnell and Diehl shared a common core of tasks with hers.  Bailey bases her claim that she was entitled to the same pay as these men on the general proposition that they all held the job classification of Director in the Human Resources department, but the

inquiry does not stop there.  It is not the job title, but the actual tasks involved in each job, that determine whether they are comparable.  Angelo, 555 F.2d at 1171.

There is no evidence that Bailey's job as Director of Diversity and Business Ethics shared a common core of tasks with the jobs of Dumas, Henrici, O'Donnell and Diehl.  Bailey admits that she has no idea what these individuals did (this is an unsurprising admission, since she never worked with Henrici or O'Donnell, or with Diehl after his promotion).  (Bailey Dep. at 196-99). Each of these individuals performed tasks completely different from the diversity and ethics duties assigned to Bailey:  Dumas was a Vice President who oversaw all human resources operations;[9] O'Donnell managed all of Agere's benefit programs; Henrici was responsible for all payroll and human resource information services functions; and Diehl handled all budget and planning matters for the Human Resources department.  (Pennington Dep. at 12, 19-20, 22). Each of these jobs is distinct from one another and from Bailey's.  They do not share a common core of tasks.  In short, Bailey has produced no evidence that she was compensated at a lower rate that white male Human Resources Directors performing equal work.  Therefore, Bailey's EPA and Title VII compensation claims must fail.

Bailey's equal pay claims also fail because she cannot even show that she was compensated differently than the other Directors she has identified: Henrici, O'Donnell and Diehl.  Bailey's salary, which she acknowledges was established under former Human Resources Director Dewayne Rideout, a black male, was $118,500.[10]  (Bailey Dep. at 62-63, 74-75; Bailey Ex. 3).  Prior to June 2001, when Bailey went out on disability leave, Diehl was receiving a

---

[9] Even though Dumas was brought in as a Director in title, the intent all along was for him to be a Vice President, which is confirmed by the fact that his compensation of $230,000 per year did not change when he officially became a Vice President in October 2001.  (Pennington Dep. at 14; Pennington Aff. Ex. A at D 0144, 0147.)

[10]  Bailey does not challenge any decisions made by Rideout in this lawsuit.

salary of $117,400 (Pennington Aff. Ex. D at D 0159), and Henrici and O'Donnell had not even

been hired.  As part of his reorganization of the Human Resources department, Pennington

reevaluated all of his Directors' salaries in the summer of 2001.  (Pennington Dep. at 53).  It was

at this time that Diehl was promoted to Director and his salary was raised to $136,000, and

Henrici and O'Donnell were hired as Directors with salaries of $190,000 and $150,000,

respectively.  (Pennington Aff. Ex. B at D 0167, Ex. C. at D 0172, Ex. D at D 0159).   Bailey's

salary for her new position as Director of Diversity and Business Ethics would have been

reevaluated around the same time if she had not been on short-term disability leave.  (Pennington

Dep. at 54).  Pennington never had the opportunity to do so, however, since Bailey was

terminated upon her release to return to work because of the threats she made toward

Pennington.  Because Pennington never had the opportunity to set Bailey's salary at all under the

new organizational structure, there is no factual basis for her allegation that she was paid less

than the individuals to whom she compares herself.

For all of these reasons, Bailey's equal pay claims must fail as a matter of law.

### 3.    Bailey's grant of stock options was non-discriminatory.

There is no evidence that Agere discriminated against Bailey during the IPO

discretionary stock option grant of March 2001.  As an initial matter, there is no evidence that

Pennington, whom Bailey alleges discriminated against her regarding that grant, treated her

unfavorably.  Pennington testified, without contradiction, that he thought Bailey was a Senior

Manager at the time he approved her stock option grant.  (Pennington Dep. at 87.)  Agere's IPO

stock option guidelines suggested a grant of 15,000 – 25,000 options for Senior Managers.

(Pennington Dep. at 89; Pennington Ex. 4).  Nevertheless, Pennington recommended, based on

conversations with Rideout, that Bailey receive an amount above this range (30,000 options) in

recognition of additional duties she undertook during the IPO.  (Pennington Dep. at 87).

Again, whether Pennington's belief that Bailey was a Senior Manager at the time was

accurate is irrelevant, <u>Brewer</u>, 72 F.3d at 332 ("no matter how mistaken the firm's managers, …

our inquiry is limited to whether the employer gave an honest explanation of its behavior"),

although, as Pennington noted, Bailey had not been approved for a Director position by

appropriate procedures at the time the stock options were granted.  (Pennington Dep. at 29-33).

Pennington gave Bailey a grant of options above that recommended for the level he believed she

occupied.  There is no evidence that, in doing so, he considered her race or sex.

### 4.    Pennington did not undermine Bailey's authority in a discriminatory manner.

Bailey also claims that Pennington undermined her authority in a manner that constitutes

race and sex discrimination.  Although the exact nature of this claim is unclear, it appears to be

based primarily on the fact that, as part of the reorganization that resulted in Bailey being offered

the position of Director of Diversity and Business Ethics, most of the staff that she previously

had supervised was laid off and she was assigned different duties.  Bailey cannot demonstrate,

however, that these actions were discriminatory.

There is no dispute that Agere was entitled to reduce its work force and reorganize the

Human Resources department.  <u>E.g.</u>, <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994)

(employer's legitimate decision to reorganize work force defeated claim of national origin

discrimination); <u>Read v. Stone & Webster Eng'r Corp.</u>, 6 F. Supp.2d 398, 402 (E.D. Pa. 1998)

(employer entitled to summary judgment on age discrimination claims where terminations were

part of a reduction in force).  Here, the reorganization of the Human Resources department came

against the backdrop of a layoff of over 2000 employees company-wide, (Pennington Aff. ¶ 4),

and the hiring of Pennington to create a new Human Resources structure for Agere as an

independent company facing new business realities.  (Pennington Dep. at 8-9).  Bailey

acknowledges, as she must, that Pennington had the authority to eliminate the positions that she

previously had supervised.  (Bailey Dep. at 56).  Notwithstanding that the function she

supervised had been eliminated, Pennington retained Bailey and gave her a position in his new Human Resources organization. There is simply no evidence that this reorganization was in any way related to Bailey's sex or race.[11]

For all of the foregoing reasons, Agere is entitled to summary judgment on Bailey's race and sex discrimination claims.

**B.     Agere is Entitled to Summary Judgment on Bailey's Disability Claim.**

Bailey claims that Agere violated the Americans With Disabilities Act ("ADA") by terminating her because of her alleged disability.[12] Bailey's ADA claim fails because (1) she failed to exhaust her administrative remedies by filing a charge of disability discrimination with the EEOC, (2) she did not have a "disability" within the meaning of the ADA at the time Agere terminated her and (3) Agere terminated her for legitimate reasons unrelated to her alleged disability.

**1.     Bailey failed to exhaust her administrative remedies with respect to her ADA claim.**

Before filing suit under the ADA, a plaintiff must exhaust her claims by filing a charge of discrimination with the EEOC and receiving a notice of right to sue. 42 U.S.C. §§ 2000e-5(e), 12117(a). These requirements are "essential parts of the statutory plan, designed to correct

---

[11] Although Bailey has identified additional, less concrete examples of instances in which Pennington allegedly undermined her authority, (Bailey Dep. 63-67), these alleged actions cannot support Bailey's claims of race and sex discrimination because they do not constitute adverse employment actions. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1999) (tangible adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). Moreover, Bailey has not demonstrated how these acts demonstrate discriminatory treatment when compared to her white male colleagues.

[12] Although Bailey's Amended Complaint also alleges that Agere failed to accommodate her disability, Bailey admits that she never requested an accommodation. (Bailey Dep. at 245-46). Therefore, she cannot purse a failure to accommodate claim. Conneen v. MBNA Am. Bank, 334 F.3d 318, 330 (3d Cir. 2003) (no duty to accommodate until employer has sufficient notice that employee is requesting an accommodation).

discrimination through administrative conciliation and persuasion if possible, rather than by formal court action." Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398 (3d Cir. 1976).  An individual is "not permitted to bypass the administrative process."  Id.  Because Bailey failed to include a claim of disability discrimination in either of her EEOC charges, she failed to exhaust her administrative remedies with respect to her ADA claim.

The relevant test in determining whether a plaintiff has properly exhausted her administrative remedies is whether the acts alleged in the judicial complaint are "fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) (quoting Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)). The court's legal analysis turns on whether there is a "close nexus" between the allegations in the EEOC charge and the subsequent judicial complaint or whether the additional allegations in the judicial complaint are "explanations of the original charge or growing out of it." Galvis v. HGO Services, 49 F. Supp.2d 445, 449 (E.D. Pa. 1999).

Where allegations of discrimination contained in a judicial complaint are not within the scope of the prior EEOC charge or the administrative investigation, the court should dismiss the allegations.  Antol, 82 F.3d at 1295 (sex discrimination claim not administratively exhausted by EEOC charge alleging discrimination based on physical disability); Fleming v. Kramont Employer Royce Realty, Inc., No. Civ. A. 02-2703, 2002 WL 1964257, *3 (E.D. Pa. Aug. 16, 2002) (dismissing sex discrimination claim where EEOC charge only alleged race discrimination); Warner v. Montgomery Township, No. Civ. A. 01-3309, 2002 WL 1623774, *6 (E.D. Pa. July 22, 2002) (granting motion for summary judgment dismissing race discrimination claim where EEOC charge referred to disability discrimination but not race discrimination).  As these cases demonstrate, it is well settled that an individual who alleges one type of discrimination in her EEOC charge may not claim a completely different type of discrimination in her judicial complaint.

Bailey's disability discrimination claim is not within the scope of her two EEOC charges or the subsequent administrative investigation.  In her initial EEOC charge, Bailey articulated claims of race and sex discrimination.  (Bailey Dep. 260-61; Bailey Ex. 29).  Bailey provided specific examples of alleged race and sex discrimination, but never articulated any claim of disability discrimination.  (Bailey Ex. 29).  Bailey's factual narrative did not contain any averment that Defendants discriminated against her because of her alleged disability.  (Bailey Ex. 29).

In her second EEOC charge, Bailey added a claim of retaliation to her race and sex discrimination allegations; she did not, however, add any claim of disability discrimination.  (Bailey Dep. at 261; Bailey Ex. 39).  In the factual narrative that accompanied her second EEOC charge, Bailey asserted:  "I was clearly terminated in retaliation for my having filed and pursued claims of employment discrimination against Agere."  (Bailey Ex. 39).  Bailey's factual narrative did not contain any averment that her termination was based on her alleged disability.  (Bailey Ex. 39).  Bailey thus could not reasonably expect that the EEOC investigation of her charges would encompass disability discrimination.  Bailey failed to exhaust her administrative remedies and Agere is entitled to summary judgment on her ADA claim.  See Antol, 82 F.3d at 1295.

**2.     Bailey was not "disabled" within the meaning of the ADA.**

The ADA defines a "disability" as:  "(A) A physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) [having] a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2); see Olson v. General Elec. Astrospace, 101 F.3d 947, 952 (3d Cir. 1996).[13]  An individual is substantially limited in a major life activity if she is:

> [u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which [she] can perform a particular major life activity as

---

[13]  Bailey only alleges a claim for actual disability.  (Bailey Dep. at 252-53).

compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i), (ii); see Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 782-83 (3d Cir. 1998).  Bailey was not "disabled" under the ADA because she cannot establish that she was substantially limited in any major life activity at the time she was terminated.  First, any limitations she had were of a temporary nature.  Second, she has not demonstrated that she ever had significant restrictions in either working or any other major life activity.

<h4 style="text-align:center">a.    Bailey's limitations were temporary and non-chronic.</h4>

Bailey cannot establish that she was "disabled" at the time she was terminated, because her alleged disability – post-traumatic stress disorder ("PTSD"), (Bailey Dep. at 69) – at best limited her only for a short period of time.  "[A] temporary, non-chronic impairment of short duration is not a disability covered by the ADA."  Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002) (citing McDonald v. Pennsylvania Dep't of Public Welfare, Polk Ctr., 62 F.3d 92, 96 (3d Cir. 1995)).

Bailey's alleged PTSD was a temporary, non-chronic condition that is not a disability under the ADA.  See McNeil v. Scotland County, 213 F. Supp.2d 559, 569 (M.D.N.C. 2002).  In McNeil, the plaintiff suffered from an episode of post-traumatic stress disorder which lasted over eleven (11) months and prevented her from working for over nine (9) months.  In granting the defendant's motion for summary judgment, the court recognized that "a temporary condition is not a disability under the ADA, even if it requires an extended leave of absence."  Id.

For similar reasons, Bailey's alleged PTSD was not a disability under the ADA.  Bailey's inability to work was limited to a six-month period.  She went out on disability on June 8, 2001. (Bailey Dep. at 67).  Her health care providers uniformly agreed that any limitations she was suffering from had subsided by October or November 2001, (Twaddle Dep. at 35; Twaddle Ex. 1 at HT 0005; Gordy Dep. at 44-45; Gordy Ex. 1 at PG0011), and she was released to return to

work on December 9, 2001.  (Goy Dep. at 34-35; Goy Ex. 9; Twaddle Dep. at 31-33; Twaddle

Ex. 4).  She has experienced no subsequent limitation in her ability to work.  (Bailey Dep. at

230-31).  These temporary limitations and the six-month interruption in Bailey's ability to work

were not substantial limitations in working or in any other major life activity.  See McNeil, 213

F. Supp.2d at 569; Layser v. Morrison, 935 F. Supp. 562, 569 (E.D Pa. 1995) (mental

impairment forcing removal of plaintiff from work force for three months too temporary to be

considered a disability); Danyluk-Cole v. St. Mary's Med. Ctr., 2001 WL 771048, *2 (E.D. Pa.

April 5, 2001) (fractured ankle causing four-month absence from work was not a disability under

ADA); see Dorn v. Potter, 191 F. Supp.2d 612, 624 (W.D. Pa. 2002) (back injury that caused

plaintiff significant problems for eight months was not a disability under the ADA).  Therefore,

Bailey was not disabled under the ADA at the time she was terminated.

### b.    Bailey was not substantially limited in her ability to work.

Even putting aside the temporary duration of her alleged impairment, there is no evidence

that Bailey was ever significantly impaired in any major life activity.  Agere acknowledges that

working is a major life activity.  29 C.F.R. § 1630.2(i).  Bailey cannot establish, however, that

she was substantially limited in her ability work.  In order to be substantially limited in her

ability to work, Bailey must show that she is "significantly restricted in the ability to perform

either a class of jobs or a broad range of jobs in various classes as compared to the average

person having comparable training, skills and abilities."  29 C.F.R. § 1630.2 (j)(3)(i).  "An

'inability to perform a single, particular job does not constitute a substantial limitation in the

major life activity of working.'"  Olson, 101 F.3d at 952 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

Here, Bailey acknowledges that she could have worked any other job for which she was qualified

as long as she did not have to work for Pennington and others in Agere's Human Resources

department.  (Bailey Dep. at 133-34).  This inability to work in a single department of a single

employer, even had it been more than temporary, is not a substantial limitation in the ability to

work.  See Olson, 101 F.3d at 952.

           c.       **Bailey was not substantially limited in any other major life activity.**

Bailey has not indicated what, if any, other major life activities she claims were

substantially limited by her alleged disability.  It is clear, however, that she had no substantial

limitation in any major life activity.  The polestar for finding a substantial limitation under the

ADA is the existence of a "significant restriction" in comparison to the "average person."

29.C.F.R. § 1630.2(j)(1); Toyota Motor Mfg., Ky. v. Williams, 122 S. Ct. 681, 691 (2002).

Bailey's health care providers have indicated that her alleged disability impaired her ability to

sleep and may have at times limited her ability to think.  There is no evidence, however, that

these were significant restrictions when compared to the average person.  Bailey's health care

providers have not quantified these limitations at all.  (Gonzalez Report, generally; Twaddle

Dep. at 33-35; Goy Dep. at 37-39).  Therefore, in addition to being temporary restrictions, Bailey

has not demonstrated that the restrictions caused by her alleged disability were ever significant

when compared to the average person.

           **3.**       **Agere did not terminate Bailey "because of" her alleged disability.**

Even assuming that Bailey had a "disability" under the ADA, there is no evidence that

Agere terminated her "because of" that disability.  See Jones v. United Parcel Serv., 214 F.3d

402, 406 (3d Cir. 2000).  To the contrary, as set forth in detail above, it is undisputed that Agere

terminated Bailey because of her threats against Pennington.  (Pennington Dep. at 67-68, 93-94;

Pennington Ex. 7).

In addition, Pennington was not aware of Bailey's alleged PTSD or any specific

limitations it caused.  Pennington could not have terminated Bailey "because of" a disability of

which he was unaware.  Jones, 214 F.3d at 406 (3d Cir. 2000) ("It is, of course, an axiom of any

ADA claim … that the employer be aware of the [plaintiff's] disability.").  For this reason also,

Agere is entitled to summary judgment on Bailey's ADA claim.[14]

**C.    Agere is Entitled to Summary Judgment on Bailey's Retaliation Claim.**

Bailey claims that Agere terminated her because she had filed a charge of discrimination with the EEOC.  In order to establish a *prima facie* case of retaliation, Bailey must show: "(1) that . . . she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action." Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).  Bailey's retaliation claim fails as a matter of law because she cannot establish a causal link between any protected activity and her termination.  As set forth in detail above, it is undisputed that Agere terminated Bailey because of her threats toward Pennington. (Pennington Dep. at 67-68, 93-94; Pennington Ex. 7).  Therefore, Bailey cannot establish the causal link necessary to support her retaliation claim.

Bailey's retaliation claim also fails because she cannot show that the decision to terminate her was a pretext for unlawful retaliation.  The burden-shifting analysis applicable to Bailey's race and sex discrimination claim also applies to her retaliation claim.  Weston, 251 F.3d at 431**.**  As with her discrimination claims, Bailey cannot establish that the decision to terminate her for threatening Pennington was a pretext for retaliation, and Agere is entitled to summary judgment on that claim.

---

[14]    The analysis applicable to Bailey's ADA claim also applies to any PHRA disability discrimination claim she has.  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

V.      **CONCLUSION**

For the foregoing reasons, this Court should grant Defendants' Motion for Summary

Judgment and dismiss Bailey's Amended Complaint with prejudice.

Respectfully submitted,

_____

Robert W. Cameron  (Pa. I.D. No. 69059)
Theodore A. Schroeder  (Pa. I.D. No. 80559)
LITTLER MENDELSON, P.C.
Dominion Tower
625 Liberty Avenue, 26th Floor
Pittsburgh, PA  15222
Tel:  (412) 201-7600

Attorneys for Defendants,
Lucent Technologies Inc. and Agere Systems Inc.

Dated:  August 29, 2003

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August, 2003, I caused a true and correct copy of the foregoing **Memorandum of Law in Support of Defendants' Motion for Summary Judgment** to be served by U.S. Mail, first-class, postage prepaid, on the following counsel of record:

> Glennis L. Clark, Esquire
> 532 Walnut Street
> Allentown, PA  18101

_____

Erika B. Fisher

PITTSBURGH:28686.1 042480.1004